## IN ADMIRALTY.—DECEMBER, 1856.

---

## RICHARD COADY *vs.* SHIP "LEWIS."

Plaintiff set up a usage among the ship chandlers of Honolulu, to make such advances and furnish such supplies to foreign whaleships as may be asked for by the masters, and upon their statement that such advances and supplies are for the use of the ship, without making any inquiry as to the necessity, either actual or apparent, for such advances and supplies. Held : that such a usage could not be set up in contravention of the rules of the general maritime law on the subject.

In a case where no negligence can be imputed to the creditor, it is necessary, if the owners would protect themselves from liability for advances made in good faith by third parties, by reason of their having an agent or consignee here to provide necessary supplies, that such agency should be made known, either by a general public notice or by a special notice to the particular creditor.

If the owners have other funds which may be properly applied for that purpose; or a consignee or agent at the place, authorised to make all repairs and supplies; then, the necessity as well as implied authority of the master to borrow money for that purpose no longer exists. The *onus* of establishing such a state of facts is on the owners; but the creditor is bound, before making an advance, to use due diligence in ascertaining that there are no other funds, or means of supply provided by the owners.

Decision of CHIEF JUSTICE LEE.

This is a suit brought to recover the sum of six hundred and forty dollars, with interest, which sum is alleged by the libellant to have been advanced by the late firm of R. Coady & Co., of which he is the surviving partner, for the use and benefit of the American whale ship "Lewis."

It appears that the "Lewis arrived at Honolulu on the 1st of December, 1855, from a cruise in the Northern seas; that Charles A. Bonney, then master of the "Lewis," received of R. Coady & Co. money to the amount claimed by the libellant, in three several instalments of $500, $40, and $100, on the 11th, 13th, and 15th of December respectively; and that Capt. Bonney gave receipts for the same,

as "for and on account of ship "Lewis" and owners." It is also in proof that previous to the arrival of the "Lewis," Capt. D. C. Waterman, of this city, had received a power of attorney from the owners in the United States, to act as agent for the ship at Honolulu, with full power, at his discretion, to remove Charles A. Bonney from the command of the "Lewis;" that upon the ship's arrival, Capt. Waterman informed Capt. Bonney of the fact that he was direct consignee of the vessel, with which Bonney expressed himself much satisfied, accompanied Capt. Waterman to the Custom House and the American Consulate on the ship's business, and informed him of the damages sustained by the "Lewis" during her cruise, upon which he ordered a survey; and that Capt. Waterman employed Capt. Wm. Stott to take charge of the ship whilst in port, and see to her repairs and supplies, of which she stood in need to a large amount. It further appears that after the lapse of a few days from his arrival, Capt. Bonney fell into dissipated habits, neglected almost entirely his duty as master of the ship; was frequently in a state of intoxication and incapacity for business; had to call in medical aid on account of *delirium tremens*; and was finally dismissed from the command of the vessel some time in the month of January.

This case is one of great importance to the business men of our community, and has been argued by the learned counsel, on both sides, with an ability commensurate with that importance.

It is not claimed by the counsel for the respondents, the owners of the "Lewis," that any positive fraud or collusion in making the advance to the master can be attributed to the libellant, or his late partner, Mr. John C. Bullions; on the contrary, it is admitted that the advance was made in good faith, and in accordance with the ordinary practice of business men here in such cases.

But it is contended on the part of the respondents, that, before making the advance, Coady & Co. were bound to inquire, with reasonable diligence, not only as to the necessity of such advance for the use of the ship, but further, as to whether or not there were funds of the owners here, either in the hands of an agent or otherwise, which might have been made available by the master for the purpose of repairing and purchasing supplies for the vessel. To this it is replied, that Coady & Co. dealt with Capt. Bonney as the agent *ex officio*, of the owners, in all matters relating to the repair and outfit of the ship; that they advanced the money upon his statement that it was for the use of the ship, as is customary among those engaged in such business in Honolulu, without deeming it necessary to inquire farther into the actual necessities of the vessel; and that if any other agent for the "Lewis" had been appointed by the owners, such agent ought to have given notice of his appointment to Coady & Co., particularly as they had furnished Captain Bonney with supplies the year previous, which supplies had been paid for by the owners without complaint, and without any warning whatever that they would not pay for such supplies as might be furnished to him in future.

This is the first time that the court has been called on to consider what is claimed to be an established usage, amounting to a custom, among the ship chandlers of Honolulu, to make such advances and furnish such supplies, on the credit of the owners abroad, as may be asked for by the masters of foreign whale ships, upon the statement

of the master that such advances and supplies are for the use of the ship, without instituting any inquiry as to whether there exists any necessity, either actual or apparent, therefor ; and upon the general presumption that vessels engaged in the whaling business, and coming to this port after long cruises at sea, are always in need of supplies or repairs to a greater or less amount. I would remark, in the first place, that it may be doubted whether the evidence adduced in this case can be considered as sufficient to prove the existence of the usage to such an extent as to create a custom possessing certainty and universality, even in Honolulu. But granting that such a custom has been proved to exist, it is necessary, before this conrt can sanction it and recognize it as a law, so as to bind parties here and elsewhere, whose rights and contracts may be affected and controled by it, to inquire into its nature and validity. It is well settled that the custom or usage of trade, being the law of that trade, it is necessary, to make it obligatory, that it be ancient—sufficiently so at least to be generally known—certain, uniform and reasonable. Let us hear the language of a few of the numerous authorities which might be cited on this point.

Mr. William W. Story, in his treatise on contracts, section 250, says: "It is not every usage, however, which is admissible even to explain a contract. For if it be inconsistent with the principles of law, or defeat the essential provisions of the contract, it cannot be given in evidence. So, also, it must not be narrow, local, and confined; nor must it be the private opinion of the few; but it must be so uniform and notorious as to afford a presumption that the parties contemplated it as a part of their contract."

In the case of the "Paragon," Ware's Rep., 322, it was held that to establish a local custom, derogating from the general law, it is not enough to prove that the act has been frequently done. It must be shown to be so generally known and recognized, that a fair presumption arises that the parties, in entering into their engagements, do it with a silent reference to the custom, and tacitly agree that their rights and responsibilities shall be determined by it.

In the case of Leach vs. Perkins, 5 Shepley's Rep., 462, it was held, in an action for labor upon a vessel, built by several owners, agaiust one of them, that evidence of the usage of the place, "that the owners were not jointly liable for materials and labor for the vessel, and that no one was authorized to make contracts for materials and labor for the vessel, so as to bind the owners generally," is inadmissible; and that the rights of parties are to be determined by law, and not by any local custom or usage, unless there be proof that such custom or usage is certain, general, frequent, and so ancient as to be generally known and acted upon, and unless it shall be adjudged to be reasonable. (See Supp. to U. S. Digest, title, custom, and usage, p. 497.)

In the case of Macy et al., vs. the Whaling Insurance Co., in the Supreme Court of Massachusetts, it was contended that "a usage exists among underwriters on whaleseips and their owners, to treat a policy of insurance on outfits as covering one-quarter part of the catchings; and that, by the usage, the use of the term *outfits* includes catchings, to the extent of one-quarter part of their amount; the same replacing and standing in lieu of outfits." Hubbard J., in delivering

MM

judgment said, "the subject is not without its difficulties; and this is true of most subjects connected with the usages of trade, till the usage becomes so well established as to form, with all persons thus engaged, a part of the admitted law of the trade. Usages become laws by their frequent repetition, their reasonableness, their adaptation to promote the interests of the parties engaged in the business to which they are applied, and by their common adoption in the community among those interested. They are, indeed, the results of the sound common sense of practical minds engaged in the same business; each party, whether buyer or seller, giver or receiver, having his own as well as the common advantage in view. But when a question of usage is brought before a court, two inquiries are necessary: the first as to its nature and extent, and the second as to its reasonableness; because a usage, to be binding, must be known and general among those engaged in the business, and received as matter of course. And, to be enforced by law, it must be reasonable in its provisions. For though usages apparently unreasonable may have been so long continued as to have acquired the force of law, yet the unreasonableness, now apparent, may have grown out of changes occurring after the usage was established. But however that may be, when the question is first presented as to giving legal effect to a usage proved to exist, where its binding force, or proof of its admissibility, is denied by one of the parties to the suit, the court will not enforce it, or give it the sanction of law, unless it be reasonable and convenient, and adapted not only to increase facilities in trade, but to the promoting of just dealings in the intercourse between parties." 9 Metcalf's Rep., 362.

In the case of Bowen *et als vs.* Stoddard, in the same court, the same learned judge said, "There was an attempt at the trial to prove that it was the usage among the merchants of New Bedford and Fairhaven, engaged in the whaling trade, to accept the bills of their masters drawn for supplies furnished abroad. But the evidence fell short of establishing it. The proof reached no further than this: that there was such confidence subsisting between the owners and masters, that bills drawn on the owners for supplies are generally accepted; but that the owners claim the right to refuse them, if from any cause they doubt the integrity of the master in the application of the funds received by him. The practice, it is said, has hitherto been found convenient; but this convenience results from the integrity of the masters, and the honorable character of the owners. Still, if it were more clearly established as a usage, yet it is not such a one as can charge the owners as acceptors; for a usage to be legal must be reasonable as well as convenient; and that usage cannot be reasonable which puts at hazard the property of the owners at the pleasure of the master, by making them responsible as acceptors on bills drawn by him, and which have been negotiated on the assumption that the funds were needed for supplies or repairs, and no evil can flow from rejecting such a usage, because owners who have confidence in the judgment and discretion as well as integrity of their shipmasters, can give them at their pleasure a limited authority to draw, which will furnish them with credit and protect them from imposition." (10 Metcalf's Rep. 380.)

The leaning of many modern decisions is decidedly against the too free adoption of usages as controlling the general rights of parties

to contracts. On this subject Justice Story remarked, in Donnell *et al. vs.* Columbian Insurance Co., " I am among those judges who think usages among merchants should be very sparingly adopted as rules of law by courts of justice, as they are often founded in mere mistake, and still more often in the want of enlarged and comprehensive views of the full bearing of principles." (2 Sumner's Reports, 377.)

The custom which is alleged to exist in the present case, is not set up in derogation of any municipal law of this country, but against a long established and universally recognized rule of the maritime law of all commercial nations; and can it be said that the owners of the "Lewis," when they fitted her out and sent her abroad, with permission to call at Honolulu or elsewhere, for necessary repairs and supplies, contemplated being bound by any such local usage as that ? Can it be said of this custom that it is so universal as to be well understood and generally recognized by persons engaged in the fitting out and employment of vessels in the whale fishery ? Is it, in itself, a reasonable custom ? Would it result in the promotion and advancement of trade and commerce? Is it calculated to suppress fraud and to promote honesty and fair dealing ? Would it give greater security and protection to the interests of those whose capital and enterprise fills our ports year after year with a vast fleet of ships laden with the treasures of the deep ? It seems to me that these are all pertinent inquiries and require to be satisfactorily answered, before the weight of judicial sanction can be lent to the upholding of the custom contended for. Can it be fairly argued that an affirmative answer may honestly be given to these inquiries ? I think not; and I deem it sufficiently clear to render it unnecessary for me to enter more at length into the discussion of the subject. But I will mention one consideration affecting this question which, it seems to me, might be deemed sufficient of itself to set the matter at rest. It is this: If Captain Bonney possessed no power and authority to bind the owners of the ship, (and it is not shown that he did,) beyond the implied authority which he derived from the general maritime law by virtue of his office as master, then he had no power to make a contract subjecting the legal rights of those owners to the operation of a local usage, the provisions of which are plainly derogatory te the principles of that law. If he did so, he exceeded his powers and did not bind his owners.

The question of usage or custom being thus disposed of, I will now proceed to consider the remaining points in the case.

It is argued on behalf of the libellant, that at the time the advance was made by Coady & Co. to Capt. Bonney, they had no knowledge of the fact that Capt. Waterman had been appointed by the owners as their agent here, and as direct consignee of the " Lewis," to attend to her repairs and supplies, and furnish what funds might be necessary; and further, that if such was the case, it was incumbent upon the owners or Capt. Waterman to have notified Coady & Co. of his agency, in order that they might have guarded themselves accordingly; because they had supplied the wants of the " Lewis " in the fall season of 1854, upon Capt. Bonney's request, and the bills drawn by him upon the owners at that time had been duly honored.

I am of the opinion that in a case when no negligence or want of

diligence can be imputed to the creditor, it is necessary, if the owners would protect themselves from liability for advances made in good faith by third parties, by reason of their having an agent or consignee here, to provide whatever supplies might be required, that such agency should be made known, either by a general public notice of such a nature that it might be deemed sufficient to notify the entire business community, or by a special notice to the particular creditor. It seems to me that justice towards those who are in the habit of making such advances demands thus much for their protection.

But it is claimed by counsel for the respondents that they have brought home express notice of Capt. Waterman's agency to Coady & Co., for Capt. Stott, who had the immediate oversight of the repairing and supplying of the ship, testifies distinctly that on the third or fourth day after her arrival, he informed Mr. John C. Bullions, at the store of Coady & Co., that Capt. Waterman was the agent here of the owners; to which Mr. Bullions replied that he had supplied Capt. Bonney the year before, and would supply him again with whatever he wanted. True, Capt. Stott may be mistaken as to the precise time when this conversation occurred, but I am satisfied, from the circumstances, that the examination and selection of some provisions by Capt. Bonney on the wharf, testified to by the book-keeper, Mr. Durham, was an entirely distinct and subsequent occurrence to the examination of provisions in the store, and the conversation referred to by Capt. Stott.

Let us pass on, however, to the consideration of the point mainly relied on by the respondents, namely, that before making the advance, Coady and Co. were bound to make reasonably diligent inquiry, not only as to the necessity of such advance for the use of the ship, but, further, as to whether or not there were funds of the owners here, either in the hands of an agent, or otherwise, which might have been made available by the master for the purpose of repairing and purchasing supplies for the vessel.

By the general maritime law, the master of a ship is the accredited agent of the owners, with full authority to contract for all repairs, naval stores, subsistence, or money necessary for the occasions of the voyage; and the furnisher of supplies, or advancer of money, in order to entitle him to recover the amount from the owner, is simply required to see that the supplies, or advances, are justified by at least *apparent* necessity. There is no burden resting upon the ship chandler, to ascertain that an *absolute* necessity exists, or to see to the actual application of the money for the purposes of the ship. Nothing more can be required of him than to make due inquiry, as to the apparent necessity for an advance of money for the supply, repair, or other legitimate purposes of the ship; and, if it appear that the repairs or supplies were really necessary, or, if no inquiries whatsoever could have put the advancer of money in possession of the real facts, and he has acted upon the representations of the master, in good faith, he is exonerated, I think, from all responsibility in regard to such inquiries. Undoubtedly the power which the master has to take up money, in a foreign port, for the use of his ship, is liable to abuse by the extravagance, indiscretion or dishonesty of the master; but he is the person selected by the owners themselves as their agent,

they repose trust in him, and hold him out to others as trustworthy, and if he fraudulently obtains advances of money, from one who supplies it in good faith, having reason to believe that a necessity exists, the lender should not suffer, but rather he should suffer who, by his confidence, has enabled the master to perpetrate the fraud. All that the maritime law requires in ordinary cases is, that the creditor shall use reasonable diligence to ascertain if there is such an apparent necessity as the master has represented; and if he does, and acts with good faith, he will be protected, and the owner be responsible to him for the repairs or supplies furnished by him. (See case of the ship "Fortitude," 3 Sum. Rep., 228, where this doctrine is discussed with great ability by Justice Story; and also the case of Spencer *vs.* Bailey & Gilbert, decided in this court in January, 1854.)

The question of what were the apparent wants of the ship, and of the obligation of the lender to make due inquiry as to her apparent necessities, is not however applicable to this case; for it is clear that she stood in actual need of repairs and supplies, to a much larger amount than could be procured with the sum advanced by Coady & Co ; and where such necessity does exist, there can be no doubt of the authority of the master, in general, to borrow money therefor. But this doctrine is subject to certain just qualifications and exceptions. For instance, if the owners have other funds which may be properly applied for that purpose; or a consignee or agent at the place, authorised to make such repairs and supplies; then the necessity as well as implied authority of the master to borrow money for that purpose no longer exists. The *onus* of establishing that there were other funds, or that there was a consignee or agent, ready and willing to advance the necessary funds, is on the owner, and not on the lender; and if the lender has acted in good faith, and without any knowledge or suspicion of the existence of such funds, or of such agent or consignee, or could not upon reasonable inquiry, have acquired knowledge thereof, then the owner will be bound, notwithstanding such funds existed or might have been obtained. (The ship "Fortitude," 1 Sum. Rep., 257.)

The fact that the "Lewis" stood in actual need of repairs and supplies, did not exonerate Coady & Co. from the obligation to make reasonable inquiry as to the existence of other funds, or means of meeting the necessary expenditure; and upon the fact whether or not they used due diligence in this respect, the decision of this case must, in my opinion, hinge. The evidence in the case shows that the owners had an agent here duly empowered to make the necessary advances for the repairs and supplies of the ship, who informed the master, immediately upon his arrival, of his appointment and powers, and who at once took charge of the ship, and furnished such repairs and supplies as she required. This agent gave notice of his appointment at the American Consulate, the Custom House, and the Pilots' and Harbor Master's Offices; and had Coady & Co. made the least inquiry, they would have ascertained that Capt. Waterman was the agent of the owners, and consignee of the ship, duly authorised by letter of credit from the owners, to furnish all funds necessary for her repairs and supplies. It is not in proof, nor is it pretended, that any such inquiry was ever made; and if there ever was a case where it was obligatory upon the lender to make such inquiry, it was this,

where the master was a drunken, dissipated man, whose habits could not fail to be well known.

It is contended on behalf of the libellant, that even if he has not the law on his side, still that equity is with him, and he ought to recover. If the money advanced had gone for the use of the ship, this might be true. But it was not so used, and the owners have never derived the least benefit from it, as all the bills of the ship were paid by her consignee, Capt. Waterman. Coady & Co. advanced the money without the use of reasonable diligence; which money it is clear was squandered, or at least never applied for the purposes of the ship; and it seems to me their claim to recover has no solid foundation, either in law or equity.

Let judgment be entered for the respondents, with costs.

Mr. Campbell, for libellant.

Mr. Bates, for respondents.

NOTE. See case of *Spencer* vs. *Bailey* and *Gilbrrt*, page —.